OPINION OF THE COURT
Anthony J. Falanga, J.
This action for divorce was commenced on or about April 25, 2005. A divorce was granted to the plaintiff after inquest on May 9, 2007 on the ground of constructive abandonment. Entry of judgment was held in abeyance pending disposition of the ancillary issues that were tried before the court on June 5, August 8, September 4, September 21, October 24, November 5, and December 11, 2007. The only witnesses who testified at the trial were the parties and Ms. D.B., called on plaintiffs case.
At the conclusion of the trial, the parties waived their rights to a trial on the issue of counsel fees and agreed that said issue would be determined upon the submission of counsels’ affirmations and supporting documentation. The court reserved decision pending the receipt of posttrial summations and memoranda of law that were served and filed by both plaintiff and defendant and marked as court exhibits IV and III, respectively, as well as affirmations on the issue of counsel fees, marked as court exhibits V and VI.
Procedural History
Pursuant to a motion and cross motion submitted on September 22, 2006, both parties moved for pendente lite relief. Said applications were decided by order dated September 27, 2006 as follows:
“This is a motion by the wife for omnibus pendente lite relief. The husband cross moves for an order 1) directing the liquidation of a certain Morgan Stanley account; 2) directing the immediate sale of the marital residence; 3) and imposing sanctions pursuant to 22 NYCRR 130-1.1.
“The parties were married on July 9, 1967. There are three emancipated children of the marriage. The wife is 57 and the husband is 58 years old.
“The wife resides in the marital residence in Mass *636 apequa purchased by the parties in 1991 for $200,000.00. There is a mortgage on the property in the sum of $112,000.00. The marital residence was appraised for $675,000.00 in August 2006. The appraisal report states that the premises has not been maintained and exhibits structural disrepair and defects. The parties have been separated since October 2005. The husband states that he resides in rented premises in Babylon at a cost of $800.00 a month, but the wife believes that the apartment is a ‘front’ and that the husband resides with his girlfriend, who is his coworker.
“Both parties are high school graduates. The wife states that she is recovering from breast cancer and suffers from a number of ailments including colitis, reflux disease, herniated discs, and Epstein Barr. The husband states that he has a heart condition. He had an angioplasty and a stent was put in his chest.
“The wife receives social security disability benefits of $692.00 a month. She is a plaintiff in a pending personal injury action.
“On the date of the preliminary conference, July 18, 2006, the husband was employed as a general manager by King[s] Jaguar of Brooklyn. His income/ ability to earn is a contested issue. His affidavit of net worth, sworn to in January 2006, states that his income is reflected in a pay stub dated January 27, 2006 showing weekly earnings of $1500.00 gross. The preliminary conference order reflects that his income is $6000.00 a month. The husband has provided a W-2 for 2004 showing that he earned $137,376.00 and a W-2 for 2005 showing earnings of $121,163.00. The wife alleges that the husband earned over $315,000.00 from King[s] Jaguar in 2002 and $250,000.00 in 2003, but she did not produce tax returns or other documentation. The wife alleges that the husband has a ‘side business’ selling cars outside the United States. She states that the husband has taken six vacations this past year and that he frequently dines in expensive restaurants with his girlfriend. The wife believes that the husband is hiding income and assets.
“The husband concedes that he earned almost $300,000.00 in 2001, but states that in recent years, *637 business at King[s] Jaguar was ‘poor.’ In his affidavit sworn to on July 10, 2006, he advised the Court that his employer had notified all employees that it was likely that the business would close within the next 18 months and he stated that he expects to earn only $100,000.00 in 2006. On or about August 1, 2006, he left his job at King[s] Jaguar and accepted a position with Manhattan Jaguar. He submitted an unsigned document entitled ‘pay plan,’ that indicates Manhattan Jaguar would pay him $1200.00 a week plus commissions, with a guarantee of $13,000.00 a month for three months after his hiring date plus the cost of COBRA. According to the husband’s affidavit sworn to on September 21, 2006, he has been laid off by Manhattan Jaguar and he is presently unemployed. The husband admits he has a ‘side business’ but states that he received only $1900.00 for selling two cars in the last 18 months. “The wife advises the Court that the husband worked for King[s] Jaguar of Brooklyn for 18 years and she believes that the husband’s employer conspired with the husband to withhold bonus monies until the termination of the divorce litigation. The wife also advises the Court that the husband declined a position with Mercedes in 2005 that would have paid him $250,000.00 a year. The wife has provided the Court with a computer print out of pages numbered 80 through 130 of the names of persons leasing Jaguars through King[s] Jaguar which she describes as the husband’s ‘portfolio’ of customers.
“The wife drives a leased 2004 Jaguar at a cost of $350.00 a month for the lease and $100.00 a month for insurance. The lease expires in March 2007. The preliminary conference order indicates that the husband drives a company car.
“The wife alleges that the husband has been physically and mentally abusive; that in October 2005, she had to jump out a window to prevent him from assaulting her; that on another occasion, she broke her nose when he threw her down a flight of stairs, necessitating surgical repair; that on another occasion he broke her thumb. She alleges that he has had several affairs throughout the marriage, infecting her three times with sexually transmitted *638 diseases; and that he has gambling, alcohol, and prescription medication addictions.
“The husband denies he ever physically or emotionally abused the wife and denies he has any gambling, alcohol or drug addictions. He points out that the wife produced no police reports or medical records to support her claims of abuse and he additionally points out that she withdrew the family offense petition filed in June 2005. The husband advises the Court that the wife had a number of plastic surgeries and that her nose was cosmetically repaired twice. He denies that he presently has any sexually transmitted disease.
“The husband states that he moved out of the marital residence to protect his health and because the wife has violent mood swings. He contends that the wife admitted to her therapist and his therapist that she carried on an extramarital affair for at least two years prior to October 2005 and he states that he can produce motel receipts and telephone records to support said contention. The wife denies ever having an affair and states she was never sexually intimate with anyone other than the husband.
“The parties own a joint Morgan Stanley account worth $56,000.00. The wife has an IRA worth $27,000.00 and the husband has an IRA worth $75,000.00. The parties had $340,000.00 on deposit in a joint Greenpoint account. After she removed the entire sum and placed it in her own name, the wife returned $170,000.00 to the husband. The husband states that he has depleted all but $19,000.00 of his half of the money, paying marital expenses, but neither party has accounted for the expenditure of said savings. The wife deposited an insurance check in the sum of $10,700.00 for damage to the marital residence in a bank account that was thereafter restrained by the bank at the husband’s request.
“Each party paid a retainer of $5000.00 by taking a cash advance on a credit card.
“Pursuant to the preliminary conference order, the parties stipulated that during the pendency of the action, the wife would have exclusive use and occupancy of the marital residence and the husband would maintain existing life and health insurance. *639 “The law is well settled that a pendente lite award should be an accommodation between the reasonable needs of the moving spouse and the financial ability of the other spouse, with due regard for the preseparation standard of living (see, DeVerna v DeVerna, 4 AD3d 323; Campanaro v Campanaro, 292 AD2d 330).
“The law is well settled that imputed income is determined, in part, upon a party’s past earnings, actual earnings, capacity to earn and educational background (see, Morrissey u Morrissey, 259 AD2d 472; Zwick v [Kulhan], 226 AD2d 734). Further, a party is obligated to demonstrate that he or she has made diligent efforts to seek employment commensurate with his or her qualifications and experience (see, D’Altilio v D'Altilio, 14 AD3d 701, Douglas v Douglas, 7 AD3d 481; Beard v Beard, [300 AD2d 268]; Kefeli v Kefeli, 270 AD2d 490; Matter of Dallin v Dallin, 250 AD2d 847; Matter of Heverin v Sackel, 239 AD2d 418; Yepes v Fichera, [230 AD2d 803]; Matter of Davis v Davis, 197 AD2d 622).
“The husband acknowledges the wife’s disability and has not asserted that she has the ability to earn income other than the $692.00 a month she receives from social security disability. The Court imputes income to the husband of $125,000.00 a year gross. “Based upon all of the foregoing, the motions are decided as follows:
“1. The husband’s cross motion is denied in all respects. Absent the consent of the parties, the Court lacks the authority to compel a sale of a tenancy by the entirety (see, Kahn v Kahn, 43 NY2d 203; Walker v Walker, 227 AD2d 469). Further, the Court will not equally or equitably distribute the funds on deposit in the parties’ joint Morgan Stanley account prior to trial. The parties have already equally apportioned $340,000.00 in marital savings and neither has accounted for the disbursement of same. Further, the husband has the ability to earn income sufficient to provide for both party’s needs during the pendency of the action.
“2. The wife is awarded interim exclusive use and occupancy of the marital residence. Commencing October 1, 2006, the husband shall pay the carrying charges on the marital residence, except that he *640 shall not be required to pay the cost of a cleaning service or the wife’s and emancipated children’s cell phones. He shall pay the cost of existing umbrella coverage. His payment of carrying charges, which total approximately $3000.00, a month shall be deemed interim non-taxable maintenance.
“3. Commencing October 1, 2006, the husband shall pay the cost of the lease and insurance on the wife’s automobile in the approximate sum of $450.00 a month. Said costs shall be deemed interim non-taxable maintenance. The husband shall either extend the existing lease, which expires in March 2007, or provide the wife with a comparable 2004 luxury automobile, during the pendency of the action.
“4. As agreed by the parties pursuant to the preliminary conference order, the husband shall maintain existing medical coverage for the benefit of the wife. He shall also pay her necessary uncovered medical, dental, optical, therapy and prescription expenses. The husband shall maintain existing insurance on his life and shall provide for the wife to be named the irrevocable beneficiary.
“5. The wife’s reasonable monthly interim needs are as follows: food $400.00; clothing $200.00; laundry and dry cleaning $30.00; gasoline and oil $200.00; recreation $430.00; cell phone $100.00 and miscellaneous $645.00. Said expenses total $2005.00 a month. The wife has income of $692.00 a month leaving her a shortfall of $1313.00 a month. Commencing October 1, 2006, the husband shall pay the wife interim non-taxable maintenance of $1313.00 a month.
“6. This order is effective retroactive to the date of service of the wife’s application on or about June 22, 2006 (see, DRL 236B; Dooley v Dooley, 128 AD2d 669). Arrears accrued between June 22, 2006 and September 30, 2006 shall be paid by the husband directly to the wife on or before October 24, 2006. The husband is entitled to a credit for sums voluntarily paid directly to the wife or to non-parties for the wife’s benefit between June 22, 2006 and September 30, 2006 for which he has cancelled checks or other similar proof of payment (see, Pascale v Pascale, 226 AD2d 439).
“7. The wife is awarded interim counsel fees of *641 $5000.00. Said sum shall be paid by the husband directly to the wife on or before October 24, 2006.
“8. The husband is restrained during the pendency of the action from making any disposition of assets acquired during the marriage except in the ordinary course of business or living.
“This constitutes the decision and order of the Court. Any relief not specifically addressed is denied. The parties and counsel shall appear at the certification conference on October 25, 2006 at 9:30 a.m. It is expected that all discovery will be completed by that date.”
The wife brought an order to show cause on February 6, 2007 seeking to hold the husband in contempt for failing to comply with the pendente lite order. She also sought an award of additional interim counsel fees. The husband cross-moved for an order imposing sanctions against the wife on the ground that her application was frivolous. Both motions were referred to the trial of the action.
Pursuant to a so-ordered stipulation dated April 13, 2007, the parties agreed as follows: to equally divide the Morgan Stanley account; that the equal division of said asset shall resolve all issues with respect to each party’s right to an equitable share of said asset; and that the husband would utilize his share of the funds in said account to pay the mortgage and utilities on the marital residence.
On August 8, 2007, during the course of the trial, the parties stipulated to list the marital residence for sale within 10 days of the date of said stipulation. Said premises was listed for sale for $899,000 (although it was appraised in August 2006 for $675,000). There is a mortgage of approximately $98,000 on the premises.
Background
Trial Testimony
The husband was called as a witness on the wife’s case and he also testified on his own direct case. In summary, he testified as follows: he has been in the auto industry business since 1970; his current place of employment is Heritage Jaguar; he started working for Heritage on April 29, 2007; he was initially engaged as a sales consultant and later was promoted to finance and insurance manager; he presently earns $500 per week plus com *642 missions; he foresees that he will earn only $80,000 in 2007, not including medical insurance and the use of an automobile with a beneficial use of approximately $5,000 a year; in 2005, he was employed by Kings Jaguar and enjoyed gross earnings of $108,777; due to the impending closing of the Kings Jaguar dealership, he left in 2006 and went to work for Manhattan Jaguar, but was there for only five weeks during July and August; his next position was with Huntington Jaguar; his total income for the year 2006 was approximately $100,000; from September 2006 through April 23, 2007, while at Huntington Jaguar, he earned approximately an average of about $5,000 per month; he earned approximately $32,000 from Huntington in 2007; after being fired by Huntington in April 2007, he secured his current employment with Heritage Jaguar where he now works on commission consisting of 20% of gross profit less $400 retained by the dealer; since starting with Heritage, he earned approximately $32,000 through November 5, 2007; in the month preceding his November 5, 2007 testimony, his employer sold 22 cars, 5 new cars and 17 preowned cars and of those sales he was the salesperson on 3; his income started to decline substantially in 2003 due to a general decline in the automobile industry and the fact that dealerships made less profit on the sale of each car; he currently drives a 2007 Jaguar provided by his employer who also pays the insurance on the car; a typical lease for the same vehicle he drives would be approximately $575 per month plus tax; the wife drives a Jaguar leased in the husband’s name and the husband pays the insurance of $1,100 per annum as well as $327 per month for the lease; the value of said lease, to a person other than a family member, would be $600 per month; on April 22, 2005, he left the marital home pursuant to an order of protection, returned in May, and left again on October 15, 2005; his wife last worked in December 2005 as a part-time medical secretary; her last full-time employment was in or about 2003 when she worked full time in the Merrick School District; although he rents a basement apartment for $1,000 per month, he has spent most of the time living with his girlfriend at her residence; he owes $20,000 in credit card debt and is paying it off with minimum payments; there is approximately $11,000 left in his IRA, as he withdrew monies to pay household expenses during the pendency of the action; he also has approximately $4,500 left of his share from the joint Morgan Stanley account which was divided between the parties pursuant to stipulation; he receives medical insurance coverage through his employment *643 and it includes coverage for his wife; he has two life insurance policies for $25,000 and $250,000; the wife is the beneficiary of both policies; in November 2004 he inherited $50,000 from his uncle; in 2003, he inherited $120,000 from his father; both inheritances were deposited in an existing joint account with his wife, although the husband initially deposited his uncle’s inheritance in a new account at Greenpoint in his name only before transferring the funds to the joint account; in 2005, a few months before commencing the within action, the wife withdrew approximately $359,000 from the joint account at Greenpoint, and, on the next day, gave the husband $168,000; he expended all of the $168,000, including $25,000 paid to an attorney to defend one of his sons on a criminal charge; the parties owned 15 Lladro collectibles; he has two and the wife has the rest.
The wife testified on her own behalf as follows: she resides in the marital residence with the parties’ emancipated son, T; for the past 15 years she has driven Jaguars and currently drives a 2004 leased Jaguar which is paid by the husband; her current income is $592 per month in Social Security disability benefits (according to her net worth statement, her testimony and her attorney’s summation she receives $592 a month, but her “trial worksheet” received in evidence and the pendente lite order dated September 27, 2006 indicate she receives $692 a month); she also has Medicare coverage; she was last employed full time about 31h years ago as a librarian in the Merrick School District and earned approximately $30,000 a year; for approximately IV2 years during 2001-2002, she worked for about 20 hours each week as a medical secretary/receptionist at South East Nassau Medical Center earning $16 per hour; she was terminated from this position, but did not explain the reason for such termination; in or about January 2003, she attempted to return to work at an affiliate of South East Nassau Medical Center, however, she was there for one day and had a “relapse” and was then let go by the employer; later, during cross-examination, she corrected herself and stated that such attempt to return to work was in 2004, however on redirect, when shown a W-2 form for the year, she acknowledged that she earned $14,000 in 2004 working part time for a period of six months and that it was in 2005 not 2004 or 2003 when she worked for one day and had a “relapse”; the husband owes approximately $13,000 under the pendente lite order for uncovered medical and prescription drugs, including a bill from Drug Mart reflecting a balance due *644 of $2,291.24; her account at Drug Mart had been closed for nonpayment; she gave notice to her husband of said Drug Mart expenses, but the account remains unpaid; the husband also owes dental expenses of approximately $1,800 and optical expenses of $350; the husband hides cash and has a side business selling cars to people in Russia; when he gave her some of the cash he would tell her that this was “payback to his employer”; she suffers from colitis, depression, anxiety, continuing discomfort from 2001 breast cancer surgery, herniated discs, posthepatic neuralgia from shingles, anemia and hemorrhoids; she is requesting the continuation of existing medical insurance coverage because Medicare pays very little; she has no life insurance; she has a $19,000 IRA and was not sure if her husband’s $30,000 IRA still existed; throughout much of the marriage she used Visa, ATT, American Express and Master Card for credit and currently only had the American Express card; her attorney has been paid $5,000 by her husband pursuant to a court order award as well as $5,000 she paid as a retainer and a “few thousand” more, but did not recall how much; she paid off the children’s college loans using the money from her share of the joint account with her husband; she conceded that without her husband’s prior knowledge she withdrew $170,000 from a joint account and two days later withdrew more and thought the total was $230,000 but she really didn’t recall; the account was at Northfork Bank and she deposited the withdrawn money into Commerce Bank; she subsequently testified that she had withdrawn a total of $340,000 (actually $340,441.24 after refreshing her recollection on cross-examination and reviewing a Greenpoint Bank statement) over a two-day period and gave her husband $170,000 and an additional $60,000 which the husband told her was his inheritance; she expended her share of what was left, approximately $170,000 mostly on her sons; in addition to paying off student college loans, she purchased a computer for her son Joseph and had her son Gregory’s sperm frozen because he had testicular cancer; she also paid off a son’s credit card bill and helped her sons in various other ways; when she asked her husband what she should do with the $170,000 he told her to do whatever she wanted; she and her husband generally traveled to St. Thomas once a year.
On cross-examination, the wife stated as follows: she was awarded Social Security disability benefits in or about 2004 on the basis of neck and back injuries, chronic fatigue, breast can *645 cer, gastroesophageal reflux disease (GERD) and irritable bowel; her breast cancer surgery was a lumpectomy; in 2006, she had four biopsies from her other breast that were all benign; on a typical day, she goes to physical therapy, at times to a movie with a friend and often takes naps; there was a total of five Lladro collectibles; she had three and her husband had two.
Upon being questioned relative to her net worth affidavit, the wife testified as follows: the amount of $600 per month for food includes food for her 35-year-old son; $500 would be the amount she expends for herself; she no longer spends $350 a month at the beauty parlor but instead approximately $200 per month; the veterinarian expense is $200 and not $300; she has cancelled newspaper delivery ($45 per month); she pays a cleaning lady $50 per week and the $170 item on the affidavit is for cablevision.
D.B., called as a witness by the wife, testified as follows: during a two-year relationship, she and the husband have traveled together on several vacations; the defendant spent less than $2,000 for any of her expenses whether while on vacation or otherwise; the husband makes no monetary contribution for living expenses, even though he stays with her at her residence in Melville, New York, a good deal of the time.
Findings of Fact and Conclusions of Law
The parties were married on July 9, 1967. At the time of the commencement of the action, they had been married for almost 38 years. Both parties are 59 years old. They have three emancipated children ages 37, 34 and 31. The wife is a high school graduate. The husband attended Nassau Community College for two years.
The husband reports that in general his health is good, although he has had heart problems as well as back problems, specifically disc issues at L-4, L-5 and S-l. He does not anticipate working beyond his 65th birthday. The wife is a breast cancer survivor. She is seeking nondurational maintenance based upon her claim of total disability, the duration of the marriage and an inability to meet her reasonable needs due to her deteriorating health. Specifically, the wife alleges that she suffers with chronic fatigue syndrome, shingles, sciatica, irritable bowel syndrome, colitis, GERD, depression and also has spinal disc herniation. She presently receives Social Security disability benefits of either $592 or $692 a month and Medicare benefits. The husband is, and has throughout the marriage, been the pri *646 mary wage earner and he is capable of being self-supporting. It is uncontroverted, however, that he has been employed by five different Jaguar dealerships in the past two years. According to his Social Security earning statement, the husband earned $281,239 in 2000; $297,039 in 2001; $226,712 in 2002; $140,795 in 2003; $137,376 in 2004; $121,724 in 2005 and $101,250 in 2006.
At the time of the marriage, neither party owned any assets of significance. During the marriage, the parties acquired the following assets: the marital residence, the furnishings and personalty in the marital residence; the Greenpoint account worth $359,000; the Morgan Stanley account worth $55,000 as of January 2006; the husband’s 401(k) and IRA with a combined value of $75,000 as of January 2006 and a combined value of $95,000 as of January 2007; the wife’s IRA and 403(b) with a combined value of $27,000, including $5,000 in her 403(b). As of November 2007, the husband had only $11,000 remaining in his 401(k) and $4,500 from his share of the Morgan Stanley funds. Both parties spent their respective shares of the Greenpoint funds.
Equitable Distribution
As both parties actively contributed in various capacities in this marriage of long duration, the marital estate should be distributed equally (see Wagner v Dunetz, 299 AD2d 347 [2002]; Ahrend v Ahrend, 123 AD2d 731 [1986]). There was no proof of any wasteful dissipation of marital assets. Neither party offered any testimony with regard to any tax impact incident to the sale or distribution of marital assets. The parties will lose the right to inherit from each other’s estate, but will share equally in retirement assets as of the date of the commencement of the action. There was no difficulty valuing any particular asset; however, neither party offered any proof as to the value of furnishings and personalty. There was no proof of any transfers made in contemplation of the commencement of the action. As the husband commingled his inherited funds with the parties’ joint savings, he is not entitled to a separate property credit (see Massimi v Massimi, 35 AD3d 400 [2006]).
The parties stipulated to the equal division of the net equity in the marital residence. The precise amount to be received by each party cannot be determined at this time as the selling price, cost of sale, and any tax consequences of the sale are not known. The parties’ stipulation equally dividing the Morgan Stanley account does not clearly set forth the amount of the dis *647 tribution received by each party. Although the testimony is not completely consistent or clear, it appears that the parties equally divided the funds on deposit in the Greenpoint account shortly after the commencement of the action. The husband has not resided in the marital residence since October 2005. He has presumably furnished his apartment and has made no demand for any furnishings or personalty from the marital residence. Accordingly, same are awarded to the wife. All other personal property presently titled to or in the possession or control of a party shall be awarded to said party. The value of the parties’ retirement assets, to wit: IRAs, 401 (k) and 403(b) shall be equally divided as of the date of commencement of the action, with each party receiving passive increases or decreases on the value of their respective shares of same from the date of commencement through the date of distribution. Counsel shall jointly retain an expert to prepare domestic relations orders necessary to accomplish this distribution. If possible, each party shall retain the funds presently on deposit in his and her IRAs, with the domestic relations orders dividing the 401(k) and 403(b) accounts being adjusted accordingly, to provided for an equal division of the parties’ retirement assets as directed herein above.
Maintenance
Imputed income is determined, in part, upon a party’s past earnings, actual earnings, capacity to earn and educational background (see Matter of Ellenbogen v Ellenbogen, 6 AD3d 1026 [2004]; Bragar v Bragar, 277 AD2d 136 [2000]; Matter of Bouchard v Bouchard, 263 AD2d 775 [1999]; Morrissey v Morrissey, 259 AD2d 472 [1999]; Matter of Zwick v Kulhan, 226 AD2d 734 [1996]; Matter of Lutsic v Lutsic, 245 AD2d 637 [1997] ). A payor’s obligation to pay support is not determined by his or her existing financial circumstances, but rather, by the ability to provide support (see Matter of Ellenbogen v Ellenbogen, supra; Matter of Bouchard v Bouchard, supra; Matter of Lutsic v Lutsic, supra). A party who is involuntarily terminated from his or her employment is required to demonstrate that he or she made diligent efforts to seek employment commensurate with his or her qualifications and experience (see Matter of D’Altilio v D'Altilio, 14 AD3d 701 [2005]; Douglas v Douglas, 7 AD3d 481 [2004]; Matter of Clarke v Clarke, 8 AD3d 272 [2004]; Beard v Beard, 300 AD2d 268 [2002]; Matter of Kefeli v Kefeli, 270 AD2d 490 [2000]; Matter of Dallin v Dallin, 250 AD2d 847 [1998] ; Matter of Heverin v Sackel, 239 AD2d 418 [1997]; Matter *648 of Yepes v Fichera, 230 AD2d 803 [1996]; Matter of Davis v Davis, 197 AD2d 622 [1993]).
The law is well settled that an award of maintenance should be designed to provide the recipient spouse with financial independence consistent with the standard of living enjoyed during the marriage, and should continue only long enough to render said spouse self-supporting (see Palestra v Palestra, 300 AD2d 288 [2002]; Granade-Bastuck v Bastuck, 249 AD2d 444 [1998]). However, not every spouse is capable of becoming self-supporting even after a period of education and training (see Loeb v Loeb, 186 AD2d 174 [1992]).
In the case at bar, the wife argues, in support of her application for an award of lifetime maintenance, that the husband offered no proof to refute her claim that she is unable to work and that her failure to work for the past three years was due to health conditions. Such argument, however, is unavailing as it is the wife who has the burden of proving that she is permanently disabled from pursuing gainful employment. The receipt by the wife of disability benefits from the Social Security Administration is not binding on this court, nor dispositive of the issue of her claimed disability and need for an award of maintenance (see Grasso v Grasso, 47 AD3d 762 [2008]).
Other than her own testimony as to the physical limitations she professes to suffer, no medical or other relevant testimony or evidence was offered to support the wife’s position that she is currently unable to work and will be so disabled for the foreseeable future. The clear conclusion is that the wife’s contention that she is totally disabled from engaging in gainful employment by virtue of various purported health problems was not supported by the proof at trial. Although she appears to have certain medical problems along with periods of depression, the wife failed to adduce persuasive competent proof of any impairment that precludes employment now or in the future.
The court notes that for the purpose of qualifying for Social Security disability benefits, the term “disability” is defined as: “inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which . . . can be expected to last for a continuous period of not less than 12 months,” taking into account the individual’s age, education and work history (42 USC § 423 [d]; § 1382c [a] [3] [B]; 20 CFR 404.1505, 416.905). The definition does not engender a determination that a disability is permanent. Further, pursuant to ap *649 plicable regulations, recipients are permitted to earn restricted amounts of income for limited periods without forfeiting Social Security disability benefits (see 20 CFR 404.1574 [b]; 416.974 [b]).
The court notes further that upon reaching the age of 62, 65 or 70, at her option, the wife will be entitled to retirement Social Security benefits based upon the husband’s earnings and will be entitled to Medicare upon attaining the age of 65. Although the record is devoid of proof (other than a statement from the Social Security Administration documenting the husband’s historic earnings) as to the extent of the Social Security retirement benefits to which the wife will become eligible, the court takes judicial notice that same will clearly exceed the amount of her present Social Security disability benefits.
The court recognizes that the wife is a 59-year-old high school graduate, with few skills, who has not been gainfully employed for several years. Her historic earnings were modest and it is not likely she can become self-supporting through education or training. The court imputes income to the wife, based on her ability to earn, of $20,800 a year ($400 a week).
The wife failed to substantiate her claim that the husband had the ability to earn significant income through a “side business” selling automobiles outside the United States. She also failed to persuade the court that the husband’s four changes of employment shortly after the commencement of the action were intentionally contrived to reduce his income. On the other hand, the husband failed to document his stated belief that his income would drop to $80,000 a year in 2007. The court finds that based upon the husband’s age, health, earning history and abilities, and over 35 years of experience in the automobile sales industry, he has the ability to earn an annual income as an automobile salesman/manager of $110,000.
In determining the issue of maintenance, this court must do more than simply impute income to each party. It must also determine the duration of maintenance. There are a plethora of cases awarding nondurational maintenance to a dependent spouse (see e.g. Hartog v Hartog, 85 NY2d 36 [1995]; Xikis v Xikis, 43 AD3d 1040 [2007]; Grumet v Grumet, 37 AD3d 534 [2007]; Kaprelian v Kaprelian, 236 AD2d 369 [1997]; Nadel v Nadel, 220 AD2d 565 [1995]). All these cases focus on the inability of the dependent spouse to become self-supporting by considering requisite factors such as the length of the marriage, the age, health, education, skills and work history of the depen *650 dent spouse and whether the dependent spouse subordinated a career to care for the payor spouse and/or the parties’ children (see Kaprelian v Kaprelian, supra). This court holds, as a matter of first impression, that a court must consider, not only the aforesaid factors, but also the prospective financial circumstances and work life expectancy of the payor spouse. The failure to do so ignores reality and principles of basic fairness necessary to reach an equitable determination.
According to the most recent statistics published by the National Center for Health Statistics, Vital Statistics of the United States (published in December 1999, but incorporated in the 2008 New York Pattern Jury Instructions), the husband herein has a work life expectancy of approximately 4 years and a life expectancy of 20 years. The wife has a work life expectancy of approximately 3 years and a life expectancy of almost 24 years. These time frames are, however, nothing more than statistical averages. It is commonplace today for people to live well into their 80s and 90s. Courts must begin to acknowledge that an award of nondurational maintenance may require a payor spouse in his or her 90s and older to continue to support a dependent spouse in his or her 90s and older. Clearly, in most cases, at some point in time, this maintenance will not be paid from earnings, but would have to come from the assets of the 70-, 80- or 90-plus-year-old payor spouse. In considering a demand by a dependent spouse for lifetime maintenance, a court must consider, not only whether the dependent spouse will require nondurational financial support, but must also determine whether the payor spouse will have sufficient assets to pay the court-ordered maintenance upon his or her retirement (see Grasso v Grasso, supra).
In the case at bar, the husband testified that he did not anticipate working beyond his 65th birthday, due in part to heart problems and back problems. The court finds, however, that the husband is capable of working beyond such age, particularly as the nature of his employment does not require physical labor. Further, in view of the parties’ limited retirement assets, their lack of savings, the speed with which they expended their marital savings and the husband’s inheritances during the pendency of this action, and their lack of assets other than the equity in the marital residence, it is apparent that the husband will have no choice but to work full time beyond his 65th birthday to support both himself and the wife. The court finds that he has the ability to work until his 70th birthday. Additionally, and, for the *651 same reasons, the wife will have to engage in at least part-time employment through her 70th birthday.
In this marriage of long duration, the wife and husband both agreed that the husband would be the primary wage earner while the wife would maintain the household and raise the parties’ three sons. The parties enjoyed a standard of living that enabled them to reside in an upper middle class area of Massapequa in a home reported to have a value of approximately $899,000. Both parties were able to drive luxury vehicles, due primarily to the husband’s employment in the automobile industry. On numerous occasions during the marriage, the husband and wife would vacation on the island of St. Thomas. As previously noted, the wife is not capable, through education or training, to earn income sufficient to enable her to become self-supporting. However, the husband’s income has declined steadily in recent years, he is 59 years old and can reasonably be expected to work only until his 70th birthday. In view of his decreased earnings, his age, health and other factors set forth at length above, the court finds it unlikely that he will prospectively earn significantly more than the $110,000 annual income imputed to him herein. Neither he nor the wife will continue to enjoy the marital standard of living subsequent to the parties’ divorce. Further, in view of the maintenance obligations imposed herein, it is unlikely that the husband will accumulate assets during the next 10 years that would enable him to pay maintenance beyond his 70th birthday.
Although the court finds that the wife is not capable of becoming self-supporting, the husband lacks the ability to pay nondurational maintenance. Any award of nondurational maintenance in a case such as this would necessarily be devoid of any consideration of relevant statistics or of a realistic analysis of the payor’s future ability to undertake such an open-ended obligation. Rather, such award would be the product of flawed speculations and assumptions, placing the emphasis on the circumstances and needs of the recipient spouse, while ignoring the enumerated factors (Domestic Relations Law § 236 [B] [6] [a]) as they apply to the payor spouse.
Moreover, while a nondurational maintenance award in this case might assuage the court’s concerns for the wife’s future financial well-being, it would do so at the expense of enslaving the historic wage earner to indefinite years of employment beyond any reasonable expected retirement. Only a balance of the realistic needs and abilities of both parties can result in an equitable maintenance determination.
*652 It should also be patently clear that in cases where the payor spouse will not possess assets sufficient to pay maintenance subsequent to an appropriate aged based retirement, awards of nondurational maintenance will necessitate future litigation burdening the courts with postjudgment applications seeking modification of the payor’s obligation.
In view of all of the foregoing, commencing on the first Friday following the sale of the former marital residence, the husband shall pay the wife maintenance of $3,000 a month. Maintenance shall terminate upon the remarriage of the wife, the death of either party, or 10 years from the date of this order. The award of maintenance shall be deductible by the husband and taxable to the wife.
The pendente lite order shall continue until the first Friday after the sale of the marital residence. As the husband paid the family expenses since the commencement of the action, both prior to and pursuant to the pendente lite order, the award of maintenance herein is not retroactive. Other than arrears for prescription medications referred to herein below, as of the date of the conclusion of the trial, the husband did not owe any pendente lite arrears.
Insurance
The husband shall maintain life insurance naming the wife as irrevocable beneficiary in a face amount sufficient to secure his obligation to pay maintenance. The husband shall maintain existing health insurance for the wife until her 65th birthday. The cost of maintaining health insurance for the wife shall be deemed maintenance and shall be deductible by the husband and taxable to the wife.
Automobile
The husband shall pay the lease and insurance on the automobile driven by the wife through the expiration of the lease. Said payments shall be deemed maintenance and shall be deductible by the husband and taxable to the wife. The wife shall have exclusive use of the vehicle until the expiration of the lease. The wife shall pay all other costs incident to her use of the vehicle. In addition, she shall pay the cost of excess mileage or damage to the vehicle upon the termination of the lease.
Contempt
By direction of the court, the wife’s application to punish the husband for contempt for his alleged failure to comply with the *653 court’s pendente lite order dated September 27, 2006, and the husband’s motion for sanctions alleging the contempt motion was frivolous were referred to the trial of the action. At the trial, the motions were resolved by stipulation on the record in that the husband agreed to pay any liability on the wife’s Drug Mart bill to the extent that said bill includes prescription medications for which the husband was responsible under the court’s pendente lite order. Said stipulation is hereby so-ordered.
The only open issue is the wife’s request for an award of counsel fees incurred in the prosecution of the contempt motion, and such issue was to be resolved on affidavits submitted in reference to the overall application for an award of fees. Accordingly, the motions are deemed withdrawn.
Counsel Fees
The issue of attorney’s fees was agreed to be decided by the court without a hearing (see Matter of Quick v Quick, 226 AD2d 644 [1996]; Willis v Willis, 149 AD2d 584 [1989]). Both counsel were given an opportunity to submit affirmations in support of their client’s respective requests for an award of fees, which affirmations could include argument against an award of fees to the other litigant.
The Court of Appeals has held that a court must consider the following factors in determining counsel fees:
“time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer’s experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved (see Matter of Potts, 213 App. Div. 59, 62, affd. 241 N. Y. 593; Code of Professional Responsibility EC 2-18; Canons of Professional Ethics, canon 12; Ann., Attorney Compensation — Amount, 56 ALR 2d 13, 20-50; see, also, H. Cohen, History of the English Bar and Attornatus to 1450, p. 279 [1929]).” (Matter of Freeman, 34 NY2d 1, 9 [1974]; see also McCann v Guterl, 100 AD2d 577 [1984].)
Furthermore, in exercising the discretionary power granted to it by the Legislature in Domestic Relations Law § 237, “a court should review the financial circumstances of both parties together with all the other circumstances of the case, which *654 may include the relative merit of the parties’ positions” (DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987]).
The husband’s attorney billed the husband for 199 hours of legal services at a cost of $64,675. The husband contends that he should not contribute toward the wife’s legal expenses and the wife should contribute toward his legal expenses on the ground that she engaged in dilatory tactics designed to delay the litigation causing him to incur unnecessary legal fees.
The wife’s attorney billed her for 206 hours of legal services at a cost of $61,842.50. Said counsel’s affirmation states that he has received $18,000 from the wife, but doesn’t indicate whether said sum includes $5,000 paid to him by the husband. The wife’s attorney points out that the wife was compelled to bring a contempt motion. He contends that as the husband was the primary wage earner during the marriage and during the pendency of the action, he should pay the wife’s legal fees. Counsel further points out that the wife has limited assets and states that she will need to preserve same to provide for her future needs.
Based upon all of the foregoing, the wife is awarded counsel fees in the sum of $20,000. Said sum shall be paid by the husband to the wife’s attorney from the husband’s share of the proceeds of sale of the marital residence.